[No. 1796]

## Z. H. LOWMAN, APPELLANT, *v.* NYE AND ORMSBY COUNTY BANK, RESPONDENT.

1. APPEAL AND ERROR—REVIEW—CONFLICTING EVIDENCE—CONCLUSIVENESS OF VERDICT.
   So far as there is any conflict in the evidence on any material facts, the verdict of the jury is conclusive on appeal.

2. PRINCIPAL AND AGENT—EVIDENCE OF AGENT'S AUTHORITY.
   Evidence *held* to show that an agent was sufficiently authorized in writing to warrant a bank in acting on his directions in delivering a deed to be recorded.

3. PRINCIPAL AND AGENT—UNAUTHORIZED ACTS OF AGENT—RATIFICATION.
   Conceding that an agent was without sufficient authority to justify a bank, pursuant to his directions, in surrendering a deed executed by the principal and deposited in escrow, the principal could ratify the action of the unauthorized agent and be bound thereby.

4. PRINCIPAL AND AGENT—RATIFICATION OF AGENT'S ACTS—SUFFICIENCY OF EVIDENCE.
   Evidence *held* sufficient to prove ratification of an agent's act in modifying a contract to transfer mining property.

5. DEEDS—UNAUTHORIZED DELIVERY—SUBSEQUENT RATIFICATION.
   Delivery of a deed not authorized by a grantor may be ratified by his subsequent conduct and acts.

APPEAL from the District Court of the Fifth Judicial District of the State of Nevada, Nye County; *J. P. O'Brien,* Judge.

Action by Z. H. Lowman against the Nye and Ormsby County Bank. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. **Affirmed.**

### STATEMENT OF FACTS

This is an action brought by the plaintiff, appellant herein, against the defendant, respondent herein, for damages in the sum of $13,500 for breach of contract. From a judgment in favor of defendant and from an order denying plaintiff's motion for a new trial, plaintiff appeals.

The complaint alleges that on or about the 14th day of August, 1906, and for a long time prior thereto, the plaintiff was the owner and in the possession of an undivided one-half interest in eighteen lode mining claims, situated in the Greenwater Mining District, Inyo County, California, and which for convenience will be referred to as the "C. U. Group"; that one

J. Q. Lisle and one T. B. Beadle were each the owners of an undivided one-fourth interest in said group; that on or about the said 14th day of August, 1906, plaintiff and said Lisle and Beadle entered into a written contract to sell and convey said "C. U. Group" of claims to one A. D. Nash and one Edgar T. Wallace for and in consideration of certain payments and conditions in said written agreement specified, a copy of which said contract was attached to and made a part of the complaint. That portion of said contract, material for consideration in this case, reads as follows: "Upon the payment by said second parties of the sum of three thousand dollars to the credit of the first parties at the Nye and Ormsby County Bank at Tonopah, Nye County, State of Nevada, on or before thirty days from the date of this agreement, the said first parties will execute good and sufficient deed or deeds of conveyance of said mining claims to said second parties, quitclaiming, selling and conveying the same to said second parties, and covenanting that the said groups of claims contains at least sixteen and one-half full claims or 330 acres more or less; said deed to be placed in escrow with said bank with instructions to be delivered to said second parties upon the payment of the sums hereinafter named to the credit of said first parties at said bank, namely: $13,500 on or before the 14th day of March, 1907; $13,500 on or before the 14th day of September, 1907. If the said second parties shall fail to make said payments or any thereof at the time and in the manner herein provided, then and in that case, this agreement shall at the option of said first parties become null and void, and all payments theretofore made shall be forfeited to the first parties as and liquidated damages for the breach of this agreement. Upon the forfeiture of this agreement said deed so placed in escrow shall be returned by said bank to the said parties of the first part. As a further consideration for said conveyance, the said second parties agree to organize a corporation under the laws of some suitable jurisdiction, with a capitalization of one million five hundred thousand dollars, represented by one million five hundred thousand shares of the par value of one dollar each. The said second parties further agree immediately upon the

delivery of said deed of conveyance to them under the terms
of this agreement they will convey said property to said cor-
poration in consideration of the issuance to said second parties
of the entire capitalization, fully paid up and nonassessable;
that they will place or cause to be placed in the treasury of
said company five hundred thousand shares of such capital
stock; that they transfer and convey to the first parties herein
one hundred thousand shares of said capital stock fully paid
up and nonassessable, to be held by said first parties subject
to any pooling agreement that the second parties herein may
enter into at the inception of said corporation; that the bal-
ance of the capital stock of said corporation shall be disposed
of by the second parties herein as to them shall seem meet
and desirable, that is to say, said second parties are to be
entitled to the remaining nine hundred thousand shares."

The complaint further alleges that on or about the 5th day
of September, 1906, the plaintiff and the said Lisle and Beadle
caused to be deposited with the defendant bank their certain
deed of conveyance of said "C. U. Group" to said Nash and
Wallace, with specific instructions to said defendant bank to
hold said deed in escrow, and to deliver the same to said
Nash and Wallace or their assigns, only in the event of com-
pliance with the terms and conditions of said written agree-
ment, and "that thereupon defendant for hire by it received,
and to be received, did accept and agree to hold the said deed
of conveyance as an escrow to be by it delivered to the said
Nash and Wallace or their assigns, only upon precedent pay-
ments of the sums of money therein mentioned, and then and
there agreed that one-half of said payments should be by it
received for plaintiff and be by defendant remitted to plain-
tiff; that thereafter, and within the time mentioned in said
agreement, the said Nash and the said Wallace paid to
defendant the sum of $3,000 therein mentioned and in pur-
suance of the terms and conditions thereof, and that there-
upon defendant remitted to plaintiff one-half of said payment,
to wit, the sum of $1,500; that on or about the 9th day
of February, A. D. 1907, and while defendant was the custo-
dian and the holder of the said deed of conveyance hereinbe-
fore mentioned, defendant then well knowing that plaintiff

had never at any time authorized the delivery of said deed of conveyance to any one except upon the precedent performance of its conditions specified at the time of its deposit in escrow with defendant as hereinbefore pleaded, and when in truth and in fact plaintiff has never at any time authorized the delivery of said deed of conveyance except upon compliance with the conditions aforesaid, defendant wilfully and deliberately delivered said deed of conveyance to the said Nash and the said Wallace without requiring as a condition precedent to said delivery the payment to defendant of any sum of money whatever for or on account of plaintiff, and that plaintiff has never at any time received from defendant or from any one else any part of the said $27,000 mentioned in said agreement hereinbefore referred to"; that on the 25th day of January, 1907, the said A. D. Nash, for a valuable consideration to him paid by the said Edgar T. Wallace, by deed of conveyance deeded to said Wallace all of the right, title, and interest of said Nash in and to the said lode mining claims; "that on the 5th day of February, A. D. 1907, for a valuable consideration to them paid by Greenwater Development and Mining Company, a corporation then created, organized, and existing under and by virtue of the laws of the State of South Dakota, the said A. D. Nash and the said Edgar T. Wallace by deed of conveyance deeded to said Greenwater Development and Mining Company all of the said lode mining claims; that each and all of the said foregoing deeds of conveyance were made and delivered without the authorization, knowledge, or consent of plaintiff save and except the deed of conveyance hereinbefore referred to and pleaded by copy as 'Plaintiff's Exhibit B,' was signed and acknowledged by plaintiff, but that its delivery to the said A. D. Nash and the said Edgar T. Wallace as hereinbefore pleaded was without the authorization or knowledge of plaintiff; that the said deeds of conveyance of the said lode mining claims to the said Greenwater Development and Mining Company, a corporation, were received by the said corporation in good faith, for a valuable consideration therefor by it paid, and without any knowledge by it had of the unauthorized and wrongful execution and delivery of the deeds of conveyance

hereinbefore mentioned and pleaded; that plaintiff elects to demand and receive from defendant the sum of thirteen thousand five hundred dollars; that from and on or about the .......... day of September, A. D. 1906, until they and each of them deeded the said lode mining claims to said Greenwater Development and Mining Company, as hereinbefore pleaded, the said Nash and the said Wallace were in the actual and exclusive possession of the same, and engaged in the operation and the development thereof, and that ever since the conveyance of the said lode mining claims by the said Nash and the said Wallace to the said Greenwater Development and Mining Company, as hereinbefore pleaded, the said company has been in the exclusive possession, operation and development of the said lode mining claims."

The answer of defendant, as amended, consists of denials of the main allegations of the complaint, except as the same may be modified by certain admissions hereinafter set forth, and new matter set up by way of defense. It is admitted that defendant received the. deed executed by the plaintiff, Lisle, and Beadle, "but alleges that said deed was delivered to it by Lisle and Beadle, and that said Lisle represented that he was the agent and attorney in fact for the plaintiff and that he acted for said plaintiff and for himself." The answer alleges that the deed was delivered "to the said Lisle, Nash, and Wallace, at the special instance and request of the said Lisle acting for himself and as attorney in fact for the plaintiff."

For a further and separate defense to the plaintiff's cause of action, the answer, as amended, alleged: "That some time during the month of January, 1907, or the early part of February, 1907, the said J. Q. Lisle demanded the return of said deed to him, and the said A. D. Nash and said Wallace agreed to said return; that the defendant herein was informed by the said J. Q. Lisle that he had the power and was the agent for the said Z. H. Lowman and entitled to receive said deed; that the defendant herein did then and there deliver up the said deed to the said J. Q. Lisle, in reliance upon such representations; that the defendant is informed and believes and, upon such information and belief, alleges the fact to be that

the said Lisle, for himself, and as such agent of the plaintiff herein and T. B. Beadle, entered into a new agreement with the said Nash and Wallace, which said new agreeement so entered into by said parties entirely superseded and set aside the said agreement set forth in the complaint herein and entered into on the 14th day of August, 1906, and by the terms of which agreement it was agreed by and between said parties that said deed from said Lowman, Beadle, and Lisle should be delivered and recorded prior to the payment of any of said sum of twenty-seven thousand dollars referred to in said first agreement, and in said second agreement, and that the said sum of twenty-seven thousand dollars should be paid on or within thirty days from the 9th day of February, 1907, and 200,000 shares of the capital stock of the Greenwater Development Company be delivered to said Lowman, Beadle, and Lisle, and that in case said Nash and Wallace failed to perform the terms and conditions of said contract said property should be reconveyed to said Lowman, Lisle, and Beadle; that thereafter, to wit, in the early part of the month of March, 1907, the said J. Q. Lisle informed the plaintiff herein that he had withdrawn the deed mentioned as Plaintiff's Exhibit B in the complaint from the defendant herein and had delivered the same to Nash and Wallace to be placed on record, and that the said Lisle informed the said Lowman of the new agreement or arrangement entered into by him for the benefit of himself and Lowman and Beadle whereby they were to receive the said twenty-seven thousand dollars within thirty days and the said 200,000 shares of the capital stock of the Greenwater Development and Mining Company; that the said Lowman did then and there inform the said Lisle that he had done right, and that he was perfectly satisfied with the new arrangement or agreement entered into by the said Lisle for himself and for the plaintiff herein, and that he consented to the arrangements thus made by the said Lisle; that after the execution of said agreement dated August 14, 1906, the plaintiff herein agreed and consented that the said deed set forth in said complaint, to wit, the deed in which plaintiff, J. Q. Lisle, and T. B. Beadle were grantors, and A. D. Nash and Edgar T. Wallace grantees, be delivered to said Nash and

Wallace without the payment of any money or the delivery of any stock by said Wallace and Nash prior to and without the performance on the part of said Nash or Wallace of any of the conditions named in said contract and by them to be performed; that said plaintiff knew that said deed had been delivered to said Nash and Wallace and acquired (acquiesced) in said delivery, and knew that said J. Q. Lisle, acting as his agent, had consented to the delivery and recordation of said deed without the payment of any money or delivery of any stock, and ratified said action of J. Q. Lisle as his agent."

Upon the trial proof was offered showing that on the 1st day of March, 1906, plaintiff and said Lisle entered into a written agreement providing that the said Lisle should prospect for and locate mineral-bearing ground, in which each should own an undivided one-half, also to examine and report upon other properties that might promote the interests of both parties, and, if possible, secure options for said Lowman. Said Lowman agreed to pay said Lisle $40 per month for his services and for one-half interest in any mining claims he might locate, and further, to sell, promote or incorporate any property to the best of his ability which said Lisle may secure for him, provided the said Lowman considered the same of merit. In pursuance of this agreement, said Lisle located two groups of claims in the said Greenwater district, one the "C. U. Group" in question and the other the "Anaconda Group." Prior to the contract in reference to the "C. U. Group," a sale had been made of the Anaconda group, for which plaintiff had received for his portion about $20,000 net. The agreed purchase price for this group was $60,000, from which price said Lisle made a discount of about $10,000 on account of certain claims in conflict. After Lisle informed plaintiff of this transaction, it met with his approval. Lisle testified in reference to a visit by Lowman to the Greenwater district in July or August of 1906 and prior to the contract in reference to the "C. U. Group," at which time plaintiff said to Lisle: " 'Now you are up here, and you understand the conditions and the situation, and I am too old a man to bother with this thing. I am going to leave it all with you, and you do that to suit yourself,' and I asked him if it would be neces-

sary to have a power of attorney acknowledged by a notary public or something to that effect. I conveyed my meaning to him in that way. I don't know the exact words I used, but he said, 'No; you go ahead and handle that to suit yourself.' That was about handling the claims and buying or selling anything that I wanted to do."

Testimony was admitted of the contents of a letter written by the plaintiff to Lisle, after the latter had located the "Anaconda" and "C. U." groups, and prior to the negotiations for the sale thereof. Mr. Lisle testified that "the essence of the letter was this: As I was a long ways from transportation, and in a country that was hard to get at, and that I had acquired some claims there by location, and that I should be fortunate enough to have a chance to dispose of them to go right ahead and use my own judgment, and that he would stand by my action." This letter the witness testified he gave to Mr. Nash when the latter asked what authority he had to represent Mr. Lowman, and that Nash still retained the letter. Also, that this letter was exhibited to Mr. Raycraft, the cashier of the defendant bank, at the time the deed was withdrawn from the defendant bank on February 9, 1907.

A letter from Lowman to Lisle, dated August 9, 1906, was admitted in evidence in which Lowman, among other things, said: "I hope you are getting along nicely and doing well. I am trying to get things shaped up here in matters you and I and Mr. Beadle spoke about, and it looks so that I may be successful—that is, regarding the organization of a company. But should you have a chance in disposing any of the property before I make any arrangements with any parties here, it is all satisfactory to me. The 12th of this month will soon be here, and it is only a matter of a few days. Now, I would like to know how you did tie up the property and what arrangements. What kind of a bond you gave, as I am in the dark about it." The testimony of Lowman shows that the agreement in reference to the sale of the "C. U. Group" was negotiated by Lisle; that he received a telegram from Lisle that he (Lisle) had sold the C. U. group; that soon thereafter he received from Lisle a letter inclosing the agreement of August 14, 1906, together with the deed; that he executed the

agreement and deed, and turned them over to his bankers, the Pasadena National Bank of Pasadena, California, with instructions to forward the same to the defendant bank, which they did, accompanied by the following letter: "Pasadena, California, September 5th, 1906. Nye and Ormsby County Bank, Tonopah, Nevada—Gentlemen: Enclosed please find two agreements and deed signed by Z. H. Lowman and wife, covering certain mining claims. These agreements are to be signed by J. Q. Lisle and T. B. Beadle, parties of the first part, and A. D. Nash, party of the second part; the deed to be executed by Mr. Lisle and Mr. Beadle. All papers are to be held by you in escrow according to the terms of the agreement. Please collect the $3,000 first payment, remitting one-half thereof to this bank for account of Mr. Lowman, the other half to be held by you for account of Mr. Lisle and Mr. Beadle; the balance of payments to be remitted for in the same proportion. Yours very truly, H. Newby, President."

Under the agreement of date August 14th, the first payment of $3,000 was made, and half thereof forwarded to the plaintiff. Lisle testified that on or prior to February 9, 1907, said A. D. Nash told him that he had parties in New York who had agreed to purchase the stock of this corporation (Greenwater Mining and Development Company), or a certain portion of it, if they acquired title to the property in question. He (Nash) "put the proposition to me this way: The money is on call there, and, if you so transfer, I will give you a side agreement—another agreement—and set this other aside—do away with the first agreement—and you will get your money instead of waiting six months; you can get your money on or before thirty days from date. * * * I accepted his proposition. I took the deeds out of escrow and delivered them to Mr. Nash to be filed for record in Inyo County, and took an agreement—a new, entirely new agreement with the purchase price—that 200,000 shares of stock of the Greenwater Development Company, * * * the $27,000 and the 200,000 shares of stock was to be delivered on or before thirty days." A form of agreement executed by Nash and Wallace, embodying the terms of the new agreement consented to by Lisle was admitted in evidence for the purpose of showing

what the new conditions were to which Lisle consented, a further provision of which agreement was that if the money was not paid the property was to be transferred back to the original owners. Pursuant to this agreement, and upon request of Mr. Lisle the defendant bank delivered up the deed, which was given to Nash and filed for record.

Concerning the circumstances of the defendant bank's surrender of the deed, its cashier, Mr. Raycraft, testified as follows: "A. Mr. Lisle and Mr. Nash came to the bank, and Mr. Lisle said he wanted to take the deed that was in escrow to the C. U. group of claims, one to eighteen, inclusive, I believe, out and send it for record. When it was stated to me what was desired, I asked Mr. Nash and Mr. Lisle, I think, what they intended to do about it, and Mr. Lisle stated that he had Mr. Lowman's power of attorney to act in the matter; also Mr. Beadle's. And before delivering the deed to Mr. Lisle I told him that I wanted some evidence of this fact. Well, either he or Mr. Nash, I don't know which it was, produced a letter written by Mr. Lowman to Mr. Lisle. I don't remember all of the contents of the letter, but I remember part of it referred to this transaction and stated that he knew nothing of the situation here and that Mr. Lisle could act in the matter as to his best judgment—that is, regarding the C. U. group of claims. Considering under that letter that he had authority to recall the deed, I gave it to him to be sent for record."

Lisle further testified that, at the time defendant bank surrendered the deed, he wrote upon a letterhead of A. D. Nash the following, and gave the same to the bank: "Tonopah, Nevada, February 9, 1907. To the Nye and Ormsby County Bank: On payment of $27,000 and 200,000 shares of the capital stock of the company formed by Wallace and Nash to which they have deeded the C. U. Queen claims Nos. 1 to 18, you will deliver the deeds to C. U. Queen now in custody to Mr. Wallace and A. D. Nash. J. Q. Lisle. T. B. Beadle. Z. H. Lowman. By J. Q. Lisle, his Attorney in Fact."

Lisle in his testimony stated that the last foregoing letter was given to the bank for the reason that the deed, after being recorded, was to be returned to the bank and held by it until

the money was paid, and this was to be their instructions. The next day, February 10th, Lisle wrote the plaintiff a letter, principally devoted to the negotiations he had been making in reference to the sale of other properties in which they were interested. This letter goes on to state: "I have made arrangements to get our money on property already sold. Will be able to get pay on $60,000 sale by discounting the interest. There is also some fractions that will cut down that payment some. Have an opportunity to meet all the people next Thursday, fix up all complaints, and get our money. Will get $27,000 on C. U. Queens in thirty days with no discount. Money is in the East and they will send it on in a few days." Lisle further testified that on or about the 10th of March, 1907, he saw the plaintiff in Los Angeles, and told him that he (Lisle) "had taken the deeds to the C. U. Queens out of escrow, and turned them over to Messrs. Wallace and Nash to enable them to deed the property to the Greenwater Development Company for the purpose of acquiring money that had been subscribed in New York, which would enable them to make the payments of the purchase price on the property, and that in consideration of this they have shortened the time of the last payment—from September, I think it was, to March—and that they had also wished to capitalize their company for three million instead of one million which was originally agreed upon, and it would double our amount of stock. * * * I told him they agreed in case they didn't pay the money to reconvey the property back to us, * * * that the deeds had been recorded. * * * Mr. Lowman said: 'Under the present circumstances of the financial conditions, I consider that you used good judgment, because under the original agreement it would be impossible for the deal to go through.' That the way the outlook of the camp was at the present time and financial conditions getting in bad shape that the property would remain in escrow for six months. At that time it looked as though it would be an utter impossibility for Nash and Wallace to raise the money at that time, and he considered that I used good judgment in allowing them to put the deed on record and raise our money. And we figured up the time when the money was to be paid, and

he said, 'Well, now, that money ought to be there, and we will go down and telegraph and see if the money has come,' and that is how the telegram was sent." The telegram referred to reads: "Los Angeles, March 12, 1907. Nye and Ormsby County Bank, Tonopah, Nevada. Did Nash make payment in C. U. Queen? Answer Hollenbeck, J. Q. Lisle." This telegram, the witness testified, was paid for by the plaintiff. Plaintiff, in his testimony, stated that he went with Lisle when this telegram was sent, and that Lisle showed him an answer thereto to the effect that the money had not been paid.

A letter of date March 31, 1907, from Nash to plaintiff, in reply to one from plaintiff to Nash of date March 26th, was introduced in evidence, and which reads: "Tonopah, Nevada, March 31, 1907. Mr. Z. H. Lowman, Los Angeles, California—My dear Sir: Your letter of the 26th inst. was received yesterday morning, on my return to town. As regards the C. U. Queen deal, I think I can explain the situation satisfactorily to you, barring the very unimportant fact that as yet we have not complied with the terms of our arrangement with you, namely, to pay you the balance due you of $27,000. Setting all jokes aside, however, the reason for this was that Mr. Wallace and myself had to leave New York to clean up some very important business here, before getting in any money, which had been already subscribed and was due before March 1st. * * * Mr. Wallace returned to New York about ten days ago, is now there, and I have no doubt will succeed in getting the proposition lined up again. Before the 14th day of March, however, we spoke to Mr. Beadle and Mr. Lisle about getting an extension of sixty days, and they acceded to it, and we and they felt sure that you would take the same view of it after the circumstances were explained. The C. U. Queen ground has been incorporated into a company called the Greenwater Development and Mining Company. This we incorporated in New York, and we got Mr. Lisle and Mr. Beadle to agree to deed the ground direct to the company instead of to us, so that this deal could be put through, we guaranteeing that in case the deal did not go through, that the entire corporation be turned over to you people intact. Hoping this explanation clears up everything

to your entire satisfaction, I remain, yours very sincerely, A. D. Nash. (F.) I enclose copy of agreement executed by myself covering extension agreed upon between myself and Lisle and Beadle."

On May 13, 1907, the Pasadena National Bank wrote the defendant bank a letter which, after reciting in full their former letter of September 5, 1906, reads: "On September 14th, you remitted to us a San Francisco draft for $2,992.50 which was the payment, less exchange, on the C. U. group of claims, as per the agreements mentioned in the above letter. Since that date we have heard nothing from you in regard to additional payments, and our client, Mr. Lowman, has requested us to write you in regard to the matter. Mr. Lowman claims that a payment of $13,500 was due in March. Unless this payment has been made, Mr. Lowman desired that the agreements and deed be returned to us."

In reply to the letter, the defendant bank answered on May 18th as follows: "Nye and Ormsby County Bank, Tonopah, Nevada, May 18, 1907. Pasadena National Bank, Pasadena, California—Gentlemen: Answering your letter of the 13th in regard to escrow which we hold on the 'C. U.' group, we beg to advise you that the payment due in March of $13,500 was not paid, but that Mr. Lisle was here at that time and made some arrangements for extension of the payment with Mr. Nash. At that time Mr. Lisle held the powers of attorney of both Mr. Lowman and Mr. Beadle, and under these circumstances we are in doubt if it would be proper for us to return these papers to Mr. Lowman unless this request was joined in by Mr. Lisle. As we presume this is a matter which can be easily arranged between Messrs. Lowman and Lisle, we would ask you to have Mr. Lisle join Mr. Lowman in this request for the return of the papers, upon receipt of which we will be glad to make any disposition of them which they may designate. Awaiting your advice, we are, yours very truly, (Signed) W. A. Shockley, for Cashier."

A copy of this letter was, by the Pasadena bank forwarded to the plaintiff whose answer was by the Pasadena bank forwarded to the defendant bank and which reads as follows: "Los Angeles, California, May 22, 1907. Nye and Ormsby

County Bank, Tonopah, Nevada—Gentlemen: Your letter addressed to the Pasadena National Bank, at Pasadena, California, *in re* escrow agreement, etc., in relation to certain mining claims, deeds to which were placed in your bank, to be delivered to Messrs. A. D. Nash and Edgar T. Wallace, under the certain conditions contained in said escrow instructions, has been by the Pasadena National Bank referred to me, and in answer thereto will state that I have advised the said bank that I at no time have ever authorized J. Q. Lisle, or any other person, either by power of attorney or otherwise, to grant any extension of time upon the payments to be made under the escrow agreement referred to, nor have I by power of attorney or otherwise, authorized any person to grant permission to, or ratify for me in my place and stead the taking out of the deed referred to except upon the strict compliance with the articles of escrow placed with you. I have investigated, and been informed upon reliable authority, that the deed has been delivered by you to the aforesaid Nash and Wallace, and that the same has been recorded in the office of the county recorder of Inyo County. This being true, I therefore look to you for the payment of the sum called for upon the delivery of the deed as hereinbefore mentioned, and as in the articles of escrow stipulated. Very respectfully, Z. H. Lowman."

To this letter the defendant bank replied as follows: "The Nye and Ormsby County Bank, Tonopah, Nevada. June 4, 1907. Mr. Z. H. Lowman, Los Angeles, California—Dear Sir: Replying to your letter of the 23d, forwarded us through the Pasadena National Bank of Los Angeles, we beg to enclose to you copy of the agreement which is deposited with the escrow we hold in regard to the C. U. Queen group of claims, and in explanation will say that this deed was entered into between Mr. Nash and Mr. Lisle, and Mr. Lisle signed as your attorney in fact. To facilitate handling the property it was deeded to the Greenwater Development Company, and this deed was placed in escrow with the original deed. Our understanding of the matter is that Mr. Wallace is now working on the deal in New York, which, if unsuccessful, the property will be redeeded to you and your partners. As we are informed that

there was no prospect of Messrs. Nash and Wallace being able to carry through the conditions as provided for in the original agreement, this arrangement was entered into between Mr. Nash and Mr. Lisle and your interests were protected by the subsequent agreement. If there is any other information which you desire in connection with this matter, kindly advise and we will be glad to give it to you. Yours very truly, W. A. Shockley, for Cashier."

Accompanying the letter of date March 31, 1907, from Nash to the plaintiff, was a proposed written agreement signed by Nash, the purpose of which was to extend the time of payment of $27,000 sixty days from the 18th day of March, 1907, which proposed agreement contained the following: "Whereas, under a subsequent agreement, dated the 9th day of February, 1907, between the same parties, the parties of the second part permitted a deed of said properties to the Greenwater Development and Mining Company to be placed on record in Inyo County, California, in order to enable the said A. D. Nash and Edgar T. Wallace to make payment of the purchase price immediately instead of in the installments called for in said first agreement."

Plaintiff testified that prior to his visit to the Greenwater district in July, 1906, he had written "several letters" to Lisle in which he told him "that he could do with the Greenwater properties as he pleased or as he saw fit," but that after such visit he wrote no such letters; that prior to the signing of the bond or option of the "C. U. Group," he had nothing whatever to do with it; that the first he heard of it was when Lisle wired him; that Lisle arranged all the details of the sale to Nash and Wallace. Plaintiff further testified that no such conversation occurred at Los Angeles between himself and Lisle, on or about March 10, 1907, as testified to by Lisle; that Lisle did not tell him of the agreement entered into between Nash and Lisle in February, or that the deed had been withdrawn from the defendant bank and filed; that when the telegram of date March 12th was sent by Lisle to the defendant bank, he supposed it was in reference to the payment of $13,500 and not of $27,000 as per the arrangements of February 9th. He further testified that he never repudiated any action taken

by Lisle in reference to their mining interests excepting that of February 9, 1907.

*Summerfield & Curler,* and *McIntosh & Cook,* for Appellant:

I.   Upon the respondent delivering the deed out of escrow in disregard of the terms of the escrow agreement and directions, and the recordation of the same, appellant had his choice of two remedies: An action in equity against the various grantors to set aside the subsequent deeds, or an action at law against respondent for its violation of its contract.  He naturally elected to select the latter remedy, which he had a right to do.  (*Finch* v. *Parl,* 76 Am. St. Rep. 588; *Legard* v. *Ghalson,* 24 Miss. 691; *Allen* v. *Slinger,* 74 Ill. 119; *Brand* v. *Williams,* 29 Minn. 238.)

II.   It is a fundamental principle that, in order to constitute an estoppel *in pais,* the party relying upon it must have been influenced by the acts or the silence of the other, and been caused thereby to act as he would not have otherwise acted.  (*Sharon* v. *Minnock,* 6 Nev. 377; *McCormick* v. *Ins. Co.,* 86 Cal. 260; *Boggs* v. *Merced Co.,* 14 Cal. 279; *Bynum* v. *Preston,* 69 Tex. 287; *De Berry* v. *Wheeler,* 128 Mo. 84; *Rorer Co.* v. *Trant,* 83 Va. 397; *Gardner* v. *Pierce,* 22 Nev. 154.)

III.   It certainly requires no great mental effort to see that respondent could not have been induced to deliver the deed out of escrow by acts or conduct of appellant which did not occur until after such delivery had been made.  There is no element of estoppel in this case.  Neither was there any state of facts sufficiently pleaded by respondent to tender an issue of estoppel.  To create an estoppel *in pais* it must be certain, and not a matter of mere inference of opinion.  (*Blodgett* v. *Perry,* 97 Mo. 307.)

IV.   Under all rules of pleading the affirmative defense of ratification must be sufficiently pleaded to fully tender issue upon all facts necessary to constitute such defense.  The law requiring Lisle to be empowered by a writing signed by appellant in order to authorize him to cause the deed to be delivered out of escrow to the grantees, the same form or mode is necessary to constitute a valid ratification by appellant of Lisle's acts in causing such delivery.  (*Edwards* v. *Carson*

*Water Co.*, 21 Nev. 488; *McCracken* v. *City of S. F.*, 16 Cal. 609; *Despatch Line* v. *Bellamy*, 12 N. H. 232; *Pollard* v. *Gibbs*, 55 Ga. 45; *Palmer* v. *Williams*, 25 Mich. 328; *Ragan* v. *Chenault*, 78 Ky. 545; *Blood* v. *Goodrich*, 12 Wend. 525; *Videau* v. *Griffin*, 21 Cal. 390; Mechem on Agency, sec. 136.)

*Bartlett, Thatcher & Gibbons*, for Respondent:

I. The deed when placed in escrow with defendant was placed there with the intent on the part of the grantors that, upon the happening of the condition subsequent, the instrument would take effect as of the date of its original delivery to the bank. (*Crooks* v. *Crooks*, 34 Ohio St. 610; *Latham* v. *Udell*, 38 Mich. 238; *Hunter* v. *Hunter*, 17 Barb. 25.) The delivery to the bank was an effectual delivery to the grantees; no other delivery was ever contemplated by the parties. Lowman had the power and authority to verbally authorize the bank to deliver the deed to the grantees without the payment of any money. If he could do so, his agent could, and if a person purporting to be his agent did so, Lowman could ratify his actions, and when ratified was bound by them. Lowman by his agent, Lisle, waived the conditions upon which the deed was to be delivered. If Lisle was not Lowman's agent, Lowman ratified his acts, and stands in the same position as if he had personally requested the bank to deliver the deed to the grantees without the payment of money or delivery of stock.

II. Actual delivery to an escrow is delivery to the grantee named in the deed. No other delivery is contemplated. Whether the conditions subsequent have been complied with does not concern the delivery. Appellant must take one horn of the dilemma. Either the delivery was void, in which case he was not divested of his title and is not damaged, or its delivery was subject to ratification.

By the Court, NORCROSS, C. J. (after stating the facts):

In so far as there is any conflict in the evidence upon any material facts, the verdict of the jury has determined such facts in favor of the defendant.

Section 1624 of the civil code of California provides: "The following contracts are invalid, unless the same, or some note

or memorandum thereof, is in writing and subscribed by the party to be charged, or by his agent: * * * 5. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing subscribed by the party sought to be charged. * * *"

It is contended that under this provision of the statute of the state in which the property was situated that Lisle could do no act in reference to the mining properties in question, binding upon the plaintiff, excepting he was authorized in writing so to do.    Further, that the plaintiff could only ratify the act of his unauthorized agent, in making delivery of the deed, by the formality of writing.    It may be conceded that Lisle did not have a power of attorney that would authorize him to execute a deed for the plaintiff; but it is not so clear that he was not authorized by the plaintiff in writing sufficiently to warrant the defendant bank to act upon his directions in delivering up the deed to be recorded for the purposes detailed in the testimony.    The cashier of the defendant bank was shown a letter from the plaintiff to Lisle in which he (Lisle) was informed that if he was fortunate enough to have a chance to dispose of any of their mining interests "to go right ahead and use my [Lisle's] own judgment and that he [Lowman] would stand by my [Lisle's] action." Lisle had previously negotiated the sale of another group of mines—the "Anaconda Group"—for the sum of $60,000, subsequently made a deduction of $10,000 from the purchase price, and all this without any authority other than the letters of the plaintiff.

The transfers of the money on all these mining deals was made through the defendant bank.    Only five days before the date of the contract for the sale of the "C. U. Group," the plaintiff wrote a letter to Lisle in which he said, "Should you have a chance in disposing of any of the property before I make any arrangements with any parties here, it is all satisfactory to me." In the same letter, doubtless referring to the Anaconda deal, the plaintiff says: "Now, I would like to know how you did tie up the property and what arrange-

ments. What kind of a bond you gave, as I am in the dark
about it." Here, it seems to us, was a recognition that Lisle
had from plaintiff very extensive powers to deal with their
mining interests. This letter was written after the plaintiff's
visit to the mining properties in July, 1906. Plaintiff testi-
fied that prior to his visit to the Greenwater district in July,
1906, he had written "several letters" to Lisle in which he
told him, "that he could do with the Greenwater properties
as he pleased or as he saw fit, but that after such visit he
wrote no such letters." In this latter statement, plaintiff's
memory was defective as is shown by his letter of August 9th.
From all the facts and circumstances shown in this case, we
think it cannot be said that the defendant bank did not exer-
cise due care in surrendering the deed upon Lisle's assump-
tion of authority.

It is contended, however, that all prior dealings between
Lisle and plaintiff were merged in the written contract of
August 14th. We are not impressed with this contention.
That contract was negotiated practically in its entirety by
Lisle, and the plaintiff did nothing more than execute the
agreement and deed upon its receipt, except to make cer-
tain immaterial changes in the agreement. We are unable
to see anything in the execution of this agreement that
should cause the defendant bank to assume that the agency
of Lisle had in any sense been changed. Lisle had made the
terms and conditions of the sale under the authority of the
plaintiff's letters. We think the defendant bank was justi-
fied in the assumption, from all the facts in its possession,
that Lisle had the authority to modify the terms of the agree-
ment, especially when it appeared that it was not at all likely
that the original agreement could be carried out, and the
change was deemed favorable to the plaintiff's and his asso-
ciate's interests.

But, conceding that the showing as to Lisle's authority was
insufficient to justify the defendant bank in surrendering the
deed, plaintiff could ratify the action of Lisle and be bound
thereby. Lisle testified that on or about March 10, 1907, he
informed the plaintiff fully as to what had transpired between
himself, Nash, and the defendant bank on February 9th pre-

ceding, and that the plaintiff approved of everything. This testimony of Lisle we must accept as true for the purposes of this appeal. There are other matters in the case that tend to support the fact that plaintiff ratified the action of Lisle. Although he knew the first payment of $13,500 was not made on March 14, 1907, and had received Nash's letter of March 31st in which the sixty days further additional extension was referred to, as well as the transaction of February 9th, recited in the proposed agreement accompanying the letter, it was not until May 13th that he caused his bankers to address a letter to the defendant bank demanding return of the deed unless the payments had been made. This was about the time the money would be due under the second modification of the original agreement. In any event, the proof of ratification is sufficient. A delivery of a deed not authorized by a grantor may be ratified by his subsequent conduct and acts. (13 Cyc. 565; *McNulty* v. *McNulty*, 47 Kan. 208, 27 Pac. 819.)

The judgment and order appealed from are affirmed.

SWEENEY, J., did not participate in the foregoing decision.